IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| J2 RESOURCES, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:20-CV-2161 |
| | § | |
| WOOD RIVER PIPE LINES, LLC, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Pending before the Court is Plaintiff J2 Resources, LLC's ("J2 Resources") emergency motion for preliminary injunction and to stay arbitration. (Doc. No. 7). Defendant Buckeye Partners, L.P. ("Buckeye") and Defendant Wood River Pipe Lines LLC ("Wood River") (collectively, "Defendants") filed a response (Doc. No. 14) and J2 Resources filed a reply (Doc. No. 15). Having carefully considered the record in this case, the parties' briefs, and the applicable law, the Court grants J2 Resources' emergency motion.

### I.    Background

J2 Resources is a company that sells pipe, valve, fitting, flange, valve automation, and engineered products. (Doc. No. 8 at 7). Buckeye is a midstream company that operates oil and gas pipelines. (Doc. No. 14 at 6). Wood River is a wholly owned subsidiary of Buckeye, which owns and operates a pipeline that runs through Illinois adjacent to Interstate 294 ("I-294"). (*Id.*).

In November 2017, J2 Resources applied to be a vendor for Buckeye. (Doc. No. 8, Ex. 1 at 17–59). As part of the application, J2 Resources agreed to certain terms and conditions contained in a "Vendor Welcome Packet." (*Id.* at 20, 31–34). Included in the terms and conditions is the following provision:

**26. <u>DISPUTES.</u>** Seller will submit any claims or disputes arising under this Purchase Order to Buyer in writing within sixty (60) days after final payment is made to Seller, or Seller's discovery of the facts giving rise to the claim or dispute, whichever occurs earlier, and Seller's failure to do so will constitute a waiver by Seller of any legal or equitable rights with respect to the subject matter of the claim or dispute. Seller agrees that any claims and disputes submitted by Seller which cannot be resolved through direct negotiation between Buyer and Seller will be submitted to mediation and, if not successful, to binding arbitration, both proceedings to be conducted by the American Arbitration Association in Houston, Texas, in accordance with its Commercial Rules and Procedures. Each party will bear its own expenses in any dispute resolution proceeding.

(*Id.* at 34) (the "Disputes Provision").

On May 9, 2019, Buckeye sent a purchase order to J2 Resources for 6,060 feet of seamless line pipe for a project on I-294.[1] (Doc. No. 8, Ex. 5). The purchase order also included terms and conditions, which included an identical Disputes Provision as the one cited above from the Vendor Welcome Packet. (*Id.* at 88). The purchase order's terms and conditions also included the following provision: "[i]f a signed Purchase Order acknowledgment or Notice of Order rejection is not received and confirmed by Buyer within three (3) business dates, Seller by default agrees to the terms and conditions of the order as stated." (*Id.* at 87; Doc. No. 14, Ex. B at 40 (an email from Buckeye associated with the purchase order containing the same default agreement language.)). Despite not signing the purchase order acknowledgment, it is undisputed that J2 Resources accepted the purchase order and delivered the line pipe in August and September 2019 (Doc. No. 8, Exs. 6 and 7).

---

[1] J2 Resources argues that the purchase order was sent by Wood River, not Buckeye. (Doc. No. 8 at 7). Although the top of the order does say "Wood River Pipe Lines LLC" and includes a provision that Wood River agrees to the key terms of the purchase order with J2 Resources (Doc. No. 8, Ex. 5 at 85–86), at least for purposes of this order, the Court agrees with Defendants that Buckeye was the entity that sent the document. Buckeye's corporate address is listed on the form; the contact person for the receiving party (Mark K. Harris) has a Buckeye email address; the invoice payment instructions direct J2 Resources to email a Buckeye email address; and the authorized signature on the purchase order was signed by Melanie Forest Sulla as an agent for Buckeye. (*Id.* at 85). Moreover, the terms and conditions attached to the purchase order says, "Buckeye Partners, L.P. Terms and Conditions of Purchase." (*Id.* at 87).

In October 2019, Buckeye sent J2 Resources a change order to modify the amount of pipe.[2] (Doc. No. 8, Exs. 8 and 9). The change order included the same terms and conditions as the purchase order. Thus, the change order also included the provision that the terms and conditions can be accepted by default (Doc. No. 8, Ex. 9 at 128), and the Disputes Provision (*id.* at 129). Once again, J2 Resources did not sign the change order acknowledgment, but it also did not send a notice of rejection.

Around late February and early March 2020, Buckeye sent emails to J2 Resources stating the pipes needed to be replaced because of alleged "bubbling up / flaking off" of the coating on the pipe, which Buckeye claimed make the "coating useless." (Doc. No. 8, Ex. 10; *see also* Doc. No. 14, Exs. E and F). On May 1st, Buckeye demanded that J2 Resources replace the defective pipe and pay for its removal and replacement. (Doc. No. 14, Ex. G; *see also* Doc. No. 8, Ex. 12). J2 denied that demand on May 6th. (Doc. No. 14, Ex. H).

On May 15, 2020, Buckeye and Wood River filed a Demand for Arbitration and Mediation with the American Arbitration Association ("AAA") asserting breach of contract, breach of express warranty, and breach of implied warranty of merchantability against J2 Resources. (Doc. No 8, Ex. 1 at 7–15; AAA Arbitration No. 01-20-0005-2764). On June 3rd, J2 Resources filed an objection to jurisdiction in the arbitration proceeding. (Doc. No. 8, Ex. 2). According to J2 Resources, the AAA arbitrators were going to be impaneled on July 16, 2020. (Doc. No. 8 at 9).

On June 18th, J2 Resources filed a declaratory judgment action against Defendants in this Court. (Doc. No. 1). Specifically, the complaint sought a judgment declaring that: (1) AAA is not

---

[2] As with the purchase order, J2 Resources argues that Wood River sent the change order; and, like the purchase order, and again on the record before it, the Court believes that the change order was sent by Buckeye. (*Compare* Doc. No. 8, Ex. 9 at 126, *with* Doc. No. 8, Ex. 5 at 85). *See also, supra* note 1. Additionally, the email J2 Resources received notifying it of the change order clearly states, "Change Request 2 was submitted for Purchase Order OP-195000 from *Buckeye Partners L.P.*" (Doc. No. 8, Ex. 8 (emphasis added)).

the appropriate forum to determine the arbitrability of Defendants' claims; (2) there is no agreement between the parties to arbitrate Defendants' claims; (3) Defendants' claims are outside the scope of the arbitration agreement; and (4) AAA is not the appropriate forum to resolve Defendants' claims. (*Id.* at 8–9).

A few days after filing the complaint—and before Defendants filed an answer— J2 Resources brought an emergency motion for preliminary injunction and to stay arbitration, which requested the Court stay the AAA arbitration and enjoin both Wood River and Buckeye from proceeding with the AAA arbitration. (Doc. No. 7 at 3). The Court held a telephone hearing on July 9th, where the parties agreed that: (1) the Defendants would file an answer by July 14th; (2) Defendants would file a response to the emergency motion by July 17th; and (3) J2 Resources would file a reply by July 20th. (*See* Doc. No. 11). The parties have complied with those deadlines. (*See* Doc. No. 12 (Defendants' answer); Doc. No. 14 (Defendants' response); Doc. No. 15 (J2 Resources' reply)).

## II.    Legal Standard

Before a court can grant a preliminary injunction, a movant must clearly show "(1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) that their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018) (quoting *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012)); *see also Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016). "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the

court's ability to render a meaningful decision on the merits." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

A preliminary injunction is an "extraordinary remedy" that should only be granted if the movant has "clearly carried the burden of persuasion" on all four factors. *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003). The movant, however, "need not prove his case." *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir. 1991) (citing *H & W Indus. v. Formosa Plastics Corp.*, 860 F.2d 172, 179 (5th Cir. 1988)).

### III.    Who Determines Arbitrability

J2 Resources asserts that the Court should enjoin Defendants from proceeding with the AAA arbitration because: (1) the Court has the authority to decide arbitrability; and (2) the claims Defendants seek to arbitrate before the AAA are not within the scope of an arbitration agreement. (Doc. No. 8). In response, Defendants argue that J2 Resources is not substantially likely to prevail on the merits of its declaratory judgment lawsuit because: (1) the parties delegated the power to decide arbitrability to the arbitrator; and (2) even if the Court does determine arbitrability, their claims fall within the scope of the parties' agreement. (Doc. No. 14).

Enforcement of an arbitration agreement involves two analytical steps. *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). "The first is contract formation—whether the parties entered into *any arbitration agreement at all*. The second involves contract interpretation to determine whether *this* claim is covered by the arbitration agreement. Ordinarily both steps are questions for the court." *Id.* (emphasis in original) (citing *Will–Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003)).

The Court's analysis changes, however, if there is an allegation that the arbitration agreement contains a clause that gives the arbitrator the primary power to rule on the arbitrability

of a specific claim (or a "delegation clause"). *See id.* (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942, (1995)). In that case, the Court's analysis is limited: "the only question, after finding that there is in fact a valid agreement, is whether the purported delegation clause is in fact a delegation clause." *Kubala*, 830 F.3d at 202 (citation omitted); *accord Reyna v. Int'l Bank of Commerce*, 839 F.3d 373, 378 (5th Cir. 2016) ("[I]f a party asserts that an arbitration agreement contains a delegation clause, th[e] court only asks (1) whether the parties entered into a valid arbitration agreement and, if so, (2) whether the agreement contains a valid delegation clause.") (internal citation and quotation omitted).

## A.   Valid Arbitration Agreement

The first step is to determine whether the parties entered into a valid arbitration agreement. *See Reyna*, 839 F.3d at 378. At this step, "the court must determine 'whether the parties entered into *any arbitration agreement at all*.'" *Maravilla v. Gruma Corp.*, 783 F. App'x 392, 395 (5th Cir. 2019) (quoting *Kubala*, 830 F.3d at 201) (emphasis in original). This inquiry requires the Court to distinguish between "validity" or "enforceability" challenges and "formation" or "existence" challenges. *Arnold v. Homeaway, Inc.*, 890 F.3d 546, 550 (5th Cir. 2018); *see also id.* (directing courts to resolve the very existence of an agreement, including "whether the alleged obligor ever signed the contract.") (quoting *Buckeye Check Cashing v. Cardegna*, 546 U.S. 440, 444 n.1 (2006)).

Determining whether there is a valid arbitration agreement is a question of state contract law and is for the courts. *Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 688 (5th Cir. 2018) (citing *Kubala*, 830 F.3d at 202). The parties' briefing seems to assume that Texas law applies in this case. Under Texas law, a binding contract requires: "(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the

terms; and (5) execution and delivery of the contract with intent that it be mutual and binding." *In re Capco Energy, Inc.*, 669 F.3d 274, 279–80 (5th Cir. 2012) (quoting *Coffel v. Stryker Corp.*, 284 F.3d 625, 640 n.17 (5th Cir. 2002)). As to the last element, whether a signature is required to bind the parties is a question of the parties' intent. *Tricon Energy Ltd. v. Vinmar Int'l, Ltd.*, 718 F.3d 448, 454 (5th Cir. 2013). Signatures are not required "[a]s long as the parties give their consent to the terms of the contract, and there is no evidence of an intent to require both signatures as a condition precedent to it becoming effective as a contract." *Huckaba*, 892 F.3d at 689 (citing *Perez v. Lemarroy*, 592 F. Supp. 2d 924, 930 (S.D. Tex. 2008)).

As an initial matter, the Disputes Provision is an agreement to arbitrate at least some claims. J2 Resources does not dispute that fact. (*See, e.g.*, Doc. No. 8 at 12 ("[The Disputes Provision] contain limited language covering only those claims and disputes submitted by Seller and arising under this Purchase Order.")). Thus, if the parties entered into a valid contract that included the Disputes Provision, then a valid arbitration agreement exists. Since both Buckeye and Wood River seek to arbitrate claims against J2 Resources, the Court analyzes both parties individually.

### 1. Buckeye

J2 Resources admits that it agreed to the terms and conditions in the Vendor Welcome Packet, including the Disputes Provision. (*See* Doc. No. 8 at 7 ("J2 Resources agreed to certain terms and conditions (including an arbitration provision) contained in a "Vendor Welcome Packet.") (citing Doc. No. 8, Ex. 1 at 34)). To be sure, the Vendor Welcome Packet clearly required J2 Resources to check a box to indicate an agreement to the terms and conditions, which it did. (*See* Doc. No. 8, Ex. 1 at 20).

J2 Resources argues that Buckeye cannot rely on the Vendor Welcome Packet to compel arbitration because: (1) Buckeye is not a party to a purchase order; and (2) the Disputes Provision

"require[s] 'Seller' to submit [its] 'claims or disputes arising under *this Purchase Order*.'" (Doc. No. 8 at 15 (emphasis in original) (quoting Doc. No. 8, Ex. 1 at 34)). The Court interprets this point as one attacking the enforceability or interpretation of the Vendor Welcome Packet rather than validity or existence, which is not an appropriate argument for the Court to consider at this procedural stage. *See Arnold*, 890 F.3d at 550. Moreover, the Court does not agree that Buckeye is not a party to the purchase order. As discussed above, the Court believes that the purchase order (and the change order) were sent by Buckeye. *See*, *supra* notes 1 and 2. Therefore, the terms and conditions in the Vendor Welcome Packet would apply to the purchase order.

Perhaps more importantly, the Court finds that J2 Resources and Buckeye entered into the purchase order agreement through their actions. J2 Resources acquiesced to the purchase order's terms and conditions when it did not send a Notice of Order rejection. (*See* Doc. No. 8, Ex. 5 at 87). The same is true for the change order. (Doc. No. 8, Ex. 9 at 128). Further, even without the default acceptance provision, J2 Resources consented to the terms of the purchase order by performing under that contract. *See, e.g., Perez*, 592 F. Supp. 2d at 930–31; *Bocchi Americas Assocs. Inc. v. Commerce Fresh Mktg. Inc.*, 515 F.3d 383, 392 (5th Cir. 2008) ("Performance of the act which the offeree was requested to promise to perform may constitute valid acceptance.") (citing *Thomas v. Reliance Ins. Co.*, 617 F.2d 122, 128 (5th Cir. 1980)).

The Court therefore finds that J2 Resources and Buckeye entered into a valid agreement to arbitrate at least some claims through the Vendor Welcome Packet, the purchase order, and the change order.

### 2. Wood River

Once again, J2 Resources contends that Wood River sent the purchase order and the change order, not Buckeye. Thus, J2 Resources admits that it and Wood River entered into a valid

agreement to arbitrate at least some claims. Defendants takes the position that Buckeye sent the purchase order and change order—a position that the Court agrees with. *See*, *supra* notes 1 and 2. Defendants do not, however, elaborate on how Wood River and J2 Resources entered into a valid arbitration agreement; instead, they seem to treat Wood River and Buckeye as one unified entity.

That being said, Defendants' response could be interpreted as saying that both Buckeye and Wood River were parties to the purchase order and change order. (*See* Doc. No. 14 at 21 ("Buckeye L.P. is not a 'non-signatory' as alleged, and Buckeye L.P., along with Wood River, can enforce [the arbitration agreement's] terms."); *see also id.* at 22 ("[E]ven if the Court were to find that Wood River was the only party to the Purchase Order and Change Order . . . ."). It is undisputed that the top of the purchase order (and the change order) says "Wood River Pipe Lines." (Doc. No. 8, Ex. 5 at 85; Doc. No. 8, Ex. 9 at 126). Moreover, both documents state that "Wood River . . . and J2 Resources . . . agree" to the pipe description, quantity, price, and delivery date. (Doc. No. 8, Ex. 5 at 85–86; Doc. No. 8, Ex. 9 at 126–27). Additionally, Wood River accepted the pipe that J2 Resources delivered pursuant to the purchase order and change order at its project on I-294 in Illinois.

Even assuming that the facts stated above did not make Wood River a party to the purchase order and change order, the Court finds that Wood River was a third-party beneficiary to those contract. Under Texas law, parties are presumed to be contracting for themselves only. *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 362 (5th Cir. 2003) (citing *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1075–76 (5th Cir. 2002)). This presumption may be overcome only if the intent to make someone a third-party beneficiary is "clearly written or evidenced in the contract." *Bridas*, 345 F.3d at 362 (quoting *Fleetwood*, 280 F.3d at 1075–76); *see also Janvey v. Alguire*, 847 F.3d 231, 243 (5th Cir. 2017).

The purchase order and change order clearly demonstrate the intent of Buckeye and J2 Resources to make Wood River the beneficiary of their contracts (again, assuming Wood River is not a direct party to those contracts). The two documents include Wood River's name and mailing address; they indicate the pipes being purchased are for Wood River's I-294 project; and they expressly state that Wood River agrees to the key terms of the pipes being purchased. (Doc. No. 8, Ex. 5 at 85; Doc. No. 8, Ex. 9 at 126). All of this is enough to overcome the presumption that Buckeye and J2 Resources only entered into these contracts "for themselves." *See Bridas*, 345 F.3d at 362. Accordingly, Wood River is either a party to or a third-party beneficiary of a contract with a valid arbitration agreement.

## B.   Delegation Clause

Delegation clauses transfer the power to decide the question of arbitrability from the courts to the arbitrator. *Kubala*, 830 F.3d at 202 (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)). Courts may not assume that the parties have agreed to arbitrate these threshold questions, however, absent clear and unmistakable evidence of their intent to do so. *Arnold*, 890 F.3d at 552 (citing *First Options*, 514 U.S. at 944–45); *see also AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)). Thus, "the question [of] *who* . . . should decide arbitrability [differs] from . . . the question *whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement—for in respect to this latter question the law reverses the presumption." *First Options*, 514 U.S. at 944–45 (emphasis in original) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)).

The Supreme Court of the United States has said that "if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the

arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019); *id.* at 529 ("[When the parties delegate arbitrability to an arbitrator], a court possesses no power to decide the arbitrability issue."). A court's inability to decide arbitrability applies even if it thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless or is frivolous. *Id.* at 529; *see also AT & T Techs.*, 475 U.S. at 649–50 ("A court has no business weighing the merits of the grievance because the agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious.") (internal citation and quotation omitted).

### 1. Incorporation of AAA Rules

In this case, Defendants identify the following portion of the Disputes Provision (i.e., the arbitration agreement) as the delegation clause:

> Seller agrees that any claims and disputes submitted by Seller which cannot be resolved through direct negotiation between Buyer and Seller will be submitted to mediation and, if not successful, to binding arbitration, both proceedings to be conducted by the [AAA] in Houston, Texas, in accordance with its Commercial Rules and Procedures.

(Doc. No. 8, Ex. 1 at 34; Doc. No. 14, Ex. A at 23).

At first glance, it may appear that the parties did *not* express their intent for the arbitrator to decide arbitrability, let alone that they did so clearly and unmistakably. The Fifth Circuit has held, however, that the clear and unmistakable standard can be met even if the contract does not have an express delegation clause. For example, a valid delegation clause exists if the arbitration agreement expressly incorporates the AAA Rules because those rules state that the arbitrator shall have the power to determine the existence, scope, or validity of the arbitration agreement.[3] *See,*

---

[3] In particular, Rule 7(a) of the AAA's Commercial Rules states: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."

*e.g.*, *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012); *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 262–63 (5th Cir. 2014); *Arnold*, 890 F.3d at 552. Additionally, "[v]irtually every circuit to have considered the issue has [agreed that] incorporation of the . . . AAA . . . rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013) (collecting cases).

The Disputes Provision incorporates the AAA's Commercial Rules. (Doc. No. 8, Ex.1 at 34 (mediation and arbitration proceedings will be "conducted by the [AAA] . . . *in accordance with its Commercial Rules* and Procedures.") (emphasis added)). Indeed, J2 Resources does not contest that fact. (Doc. No. 14 at 12 ("[The Disputes Provision] only refers (and *incorporates the AAA rules for delegation purposes*) any claims or disputes *submitted by Seller.*") (first emphasis added; second emphasis in original) (quotation omitted)). Accordingly, the Disputes Provision contains a valid delegation clause for at least some claims between J2 Resources and Defendants.

## 2. Determining the Scope of the Delegation Clause

Having determined that the Disputes Provision does delegate the arbitrability of *something* to the arbitrator, the question then becomes whether the Court's analysis ends or whether it continues to determine if the delegation clause applies to the particular claims Defendants seek to arbitrate against J2 Resources. Defendants argue for the former and J2 Resources, of course, maintains the latter is appropriate.

The Fifth Circuit has said that "[t]he mere fact that an arbitration provision does not apply to every possible claim does not render the parties' intent to delegate threshold questions about that provision less clear." *Arnold*, 890 F.3d at 553. Consequently, courts routinely reject arguments that certain claims exceed the arbitration agreement when a delegation clause exists. *See, e.g., id.*;

*Crawford*, 748 F.3d at 262–63 (concluding that the parties' clear and unmistakable evidence to arbitrate arbitrability means the issue of whether the claims are subject to arbitration "must be decided in the first instance by the arbitrator."); *Kubala*, 830 F.3d at 204 (rejecting "a variety of contract-interpretation arguments" that the arbitration agreement does not apply to certain claims because "those are precisely the sort of issues that, in the presence of a valid delegation clause, [courts] cannot resolve.").

Other courts, however, have analyzed whether the delegation clause applies to the claims at issue in the case when the arbitration clause is narrowly drafted. *See, e.g., Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 281–82 (5th Cir. 2019) (procedural history omitted); *Mem'l Hermann Health Sys. v. Blue Cross Blue Shield of Tex.*, No. CV H-17-2661, 2017 WL 5593523, at *8 (S.D. Tex. Nov. 17, 2017). The most relevant case to adopt this "scope of the delegation clause" approach—and the case the parties spend the most time discussing in their briefs—is the Fifth Circuit's 2019 decision in *Archer and White*.

In *Archer and White*, the plaintiff filed a lawsuit seeking money damages and injunctive relief for alleged violations of the Sherman Act, the Clayton Act, and the Texas Free Enterprise and Antitrust Act. *See*, 935 F.3d at 277. The defendants moved to compel arbitration. *Id.* at 278. The arbitration clause at issue in that case provided:

> Any dispute arising under or related to this Agreement (except for actions seeking injunctive relief and disputes related to trademarks, trade secrets, or other intellectual property of Pelton & Crane), shall be resolved by binding arbitration in accordance with the arbitration rules of the [AAA].

*See id.* at 277.

A Magistrate Judge determined that the incorporation of the AAA rules was a valid delegation clause and thus granted the motion to compel arbitration. *See id.; see also Archer & White Sales, Inc. v. Henry Schein, Inc.*, No. 2:12-CV-572-JRG-RSP, 2013 WL 12155243, at

*2–3 (E.D. Tex. May 28, 2013) (procedural history omitted). Since the plaintiff sought injunctive relief (at least in part) and the arbitration clause carved-out actions for injunctive relief, the District Court vacated the Magistrate Judge's order; specifically, it ruled that: (1) the incorporation of the AAA rules did not create a clear and unmistakable intent to arbitrate arbitrability for claims that fall "squarely within the clause excluding [such claims] from arbitration;" and (2) even if a delegation clause existed, the "wholly groundless" exception applied. *Archer & White Sales, Inc. v. Henry Schein, Inc.*, No. 2:12-CV-572-JRG, 2016 WL 7157421, at *7–9 (E.D. Tex. Dec. 7, 2016) (procedural history omitted).

On appeal, the Fifth Circuit affirmed based on the "wholly groundless" exception without determining if a valid delegation clause existed. *See Archer & White Sales, Inc. v. Henry Schein, Inc.*, 878 F.3d 488, 495–98 (5th Cir. 2017) (procedural history omitted). The Supreme Court vacated that opinion and rejected the "wholly groundless" exception. *Henry Schein*, 139 S. Ct. at 531. The Court, however, "express[ed] no view about whether the contract at issue . . . in fact delegated the arbitrability question" and remanded the case to the Fifth Circuit to address that issue in the first instance. *Id.*

On remand, the Fifth Circuit acknowledged—consistent with this Court's analysis above—that the incorporation of the AAA rules "delegate[s] the threshold arbitrability inquiry to the arbitrator for at least some category of cases." *Archer & White*, 935 F.3d at 280. Also, similar to this case, the defendants argued that the existence of a delegation clause for any claim ends the inquiry; and the plaintiff argued that the delegation clause must be read to see if the particular claim at issue is covered by the delegation clause. *See id.* at 279. The Fifth Circuit agreed with the plaintiff.

> The most natural reading of the arbitration clause at issue here states that any dispute, except actions seeking injunctive relief, shall be resolved in arbitration in

accordance with the AAA rules. The plain language incorporates the AAA rules—
and therefore delegates arbitrability—for all disputes *except* those under the carve-
out. Given that carve-out, we cannot say that the Dealer Agreement evinces a "clear
and unmistakable" intent to delegate arbitrability.

> We are mindful of the [Supreme] Court's reminder that when the parties'
> contract delegates the arbitrability question to an arbitrator, the courts must respect
> the parties' decision as embodied in the contract. But we must also heed its warning
> that courts should not assume that the parties agreed to arbitrate arbitrability unless
> there is clear and unmistakable evidence that they did so. The parties could have
> unambiguously delegated this question, but they did not, and we are not empowered
> to re-write their agreement.

*Id.* at 281–82 (emphasis in original) (internal citations and quotations omitted). Importantly, just

weeks ago, the Supreme Court granted the defendants' petition for certiorari to answer the question

of "[w]hether a provision in an arbitration agreement that exempts certain claims from arbitration

negates an otherwise clear and unmistakable delegation of questions of arbitrability to an

arbitrator.[4] *Henry Schein, Inc. v. Archer & White Sales, Inc.*, No. 19-963, 2020 WL 3146679 (U.S.

June 15, 2020); *see also* Petition for Writ of Certiorari, *Henry Schein, Inc. v. Archer & White Sales,

Inc.*, No. 19-963 (Jan. 31, 2020), https://www.supremecourt.gov/DocketPDF/19/19-

963/130539/20200131112522163_Henry_Schein_cert_petition.pdf.

J2 Resources urges the Court to analyze the delegation clause in the Dispute Provision

based on its "most natural reading," just like the Fifth Circuit did in *Archer and White*. *See*,

935 F.3d at 281–82. It argues the arbitration clause "only refers (and incorporates the AAA for

delegation purposes) any claims and disputes *submitted by Seller*." (Doc. No. 8 at 12) (emphasis

in original) (internal quotation marks omitted). In other words, J2 Resources says that the scope of

---

[4] This Court notes that the Supreme Court also denied the plaintiff's cross-petition asking, in part, "[w]hether an
arbitration agreement that identifies a set of arbitration rules to apply *if* there is arbitration clearly and unmistakably
delegates to the arbitrator disputes about *whether* the parties agreed to arbitrate in the first place." *Archer & White
Sales, Inc. v. Henry Schein, Inc.*, No. 19-1080, 2020 WL 3146709 (U.S. June 15, 2020); *see also* Petition for Writ of
Certiorari, *Archer & White Sales, Inc. v. Henry Schein, Inc.*, No. 19-1080 (Mar. 2, 2020) (emphasis in original),
https://www.supremecourt.gov/DocketPDF/19/19-1080/134717/20200302182031999_archer%20II%20--%20cross-
petition%20--%20FILED.pdf.

the delegation clause—as opposed to the scope of the arbitration agreement—does not include claims submitted by anyone other than "Seller." (*See* Doc. No. 8 at 12 ("This operates just like a carve out.")). Accordingly, J2 Resources contends, there is not enough evidence to rise to the level of "clear and unmistakable" evidence that the parties intended to delegate arbitrability to the Defendants' claims. (Doc. No. 8 at 13).

Defendants assert that the Court should not follow the Fifth Circuit's holding in *Archer and White* because that case "is not controlling, not persuasive, and is now pending before the" Supreme Court. (Doc. No. 14). Specifically, they claim that applying *Archer and White* would make the Court decide arbitrability before it decides delegation, which is contrary to Supreme Court and Fifth Circuit precedent. (*Id.* (first citing *Reyna*, 839 F.3d at 378; and then citing *Henry Schein*, 139 S. Ct. at 530)). In other words, Defendants say that the Fifth Circuit's analysis (and the one proposed by J2 Resources) "is tantamount to an additional third step the Supreme Court rejected when it struck down the 'wholly groundless' exception." (*See id.* at 15; *see also id.* at 16 ("The Court is prohibited from conducting any analysis of whether Buckeye's claims fall within the delegation provision for the very same reasons district courts are prohibited from conducting a 'wholly groundless' exception.")). Moreover, Defendants assert that *Archer and White* is distinguishable from this case. (*Id.* at 16–17 ("[In this case,] [t]here . . . is no carve-out like in *Archer & White* and thus *Archer & White* does not control.").

It is also worth noting the circuit split between the Courts of Appeal (which clearly contributed to the Supreme Court initially granting certiorari in *Archer and White*). The Fifth Circuit adopted much of its legal justification from *NASDAQ OMX Group, Inc. v. UBS Securities, LLC*, 770 F.3d 1010 (2nd Cir. 2014). In *NASDAQ*, the arbitration clause stated that, "[e]xcept as may be provided in the NASDAQ OMX Requirements, all claims, disputes, controversies and

other matters in question between the Parties to this Agreement . . . shall be settled by final and binding arbitration." *See*, 770 F.3d at 1031. Because there was an arguable basis that the dispute to be arbitrated fell into the "excepted" category, the Second Circuit found there was not clear and unmistakable evidence that the parties delegated arbitrability to the arbitrator. *Id.* at 1032.

In contrast, in *Oracle America*, the Ninth Circuit held that an arbitration agreement that incorporated UNCITRAL rules was a clear and unmistakable delegation of arbitrability. *See*, 724 F.3d at 1075. It also rejected an argument that a carve-out provision for intellectual property rights or compliance with a license negated the delegation clause because that argument "conflates the *scope* of the arbitration clause" with "the question of *who* decides arbitrability." *Id.* at 1076 (emphasis in original); *see also id.* ("The decision that a claim relates to intellectual property rights or compliance with the TCK License *constitutes an arbitrability determination*, which the parties have clearly and unmistakably delegated to the arbitrator by incorporating the UNCITRAL rules.") (emphasis added).

Despite the various cases that may seem to suggest that the mere existence of a delegation clause precludes a determination of that clause's scope, the Court finds that the incorporation of the AAA's Commercial Rules as to some claims does not end the inquiry into whether the claims Defendants seek to arbitrate are covered by that delegation clause. First, J2 Resources is technically correct that the most recent Fifth Circuit opinion in *Archer and White* is binding authority on this Court.[5] *See, e.g., Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1121 n.8 (5th Cir. 1992) ("It has been long established that a legally indistinguishable decision of [a Fifth Circuit

---

[5] Defendants argue that the Fifth Circuit's opinion in *Archer and White* is contrary to earlier Fifth Circuit precedent that the delegation determination is a limited two-part test. (Doc. No. 14 at 14 (citing *Reyna*, 839 F.3d at 378)). As discussed below, *Archer and White* did not fail to follow or attempt to overrule *Reyna*, rather the former's determination of whether a valid delegation clause exists was factually distinguishable from the determination in the latter.

panel] must be followed by . . . district courts unless overruled *en banc* or by the United States Supreme Court."). There has been no *en banc* Fifth Circuit opinion that overruled *Archer and White*; and the Supreme Court's grant of certiorari does not itself override Fifth Circuit precedent.[6] *See Wicker v. McCotter*, 798 F.2d 155, 157–78 (5th Cir. 1986). Consequently, *Archer and White* is controlling precedent and so the Court must follow its guidance that incorporation of AAA rules does not end the delegation clause analysis. *See*, 935 F.3d at 279–82.

Moreover, determining the scope of a delegation clause is consistent with Supreme Court and Fifth Circuit authority. It is beyond dispute that the parties' agreement determines if the arbitrability issue is delegated to the arbitrator. *See First Options*, 514 U.S. at 943 ("[T]he question of 'who has the primary power to decide the arbitrability' turns upon what the parties agreed about *that* matter.") (emphasis in original). Thus, the arbitrator can only be delegated claims that the parties clearly and unmistakably intended to transfer such power to. *See Kubala*, 830 F.3d at 201 ("A delegation clause giv[es] the arbitrator the primary power to rule on the arbitrability of *a specific claim* . . . .") (emphasis added); *see also Rent-A-Ctr.*, 561 U.S. at 68–69 ("We have recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy. . . . This line of cases merely reflects the principle that arbitration is a matter of contract.") (citations omitted). To be sure, the Fifth Circuit has specifically left open the possibility

---

[6] The Court recognizes the inherent possibility that the Supreme Court could reverse *Archer and White*—and indirectly this Court—over the course of the next year. At the same time, this Court cannot rule on pending matters based on its speculation (or the parties' speculation) on the Supreme Court's future decisions. Moreover, based on the current state of the law, the Court cannot say that the Supreme Court reversing *Archer and White* is more or less probable than it affirming the Fifth Circuit's decision. Finally, this Court finds the contractual language in this case, as discussed later in the text, to be much more compelling than in *Archer and White*, and as such a reversal of that case might not affect the outcome here.

"that a contract might incorporate the AAA rules but nonetheless otherwise muddy the clarity of the parties' intent to delegate."[7] *Arnold*, 890 F.3d 546.

In addition, the Supreme Court and the Fifth Circuit have distinguished between challenges to an arbitration clause and challenges to a delegation clause. *Rent-A-Ctr.*, 561 U.S. at 72 ("[U]nless Jackson challenged the delegation provision specifically, we must treat it as valid . . . and enforce it . . . ."); *Edwards v. Doordash, Inc.*, 888 F.3d 738, 744 (5th Cir. 2018) ("If there is an agreement to arbitrate with a delegation clause, and *absent a challenge to the delegation clause itself*, we will consider that clause to be valid and compel arbitration.") (emphasis added). J2 Resources argues that the incorporation of the AAA rules only applies to a narrow set of claims (i.e., claims and disputes submitted by Seller). (Doc. No. 8 at 12–13). That is a challenge to the delegation clause. The Court thus must determine the scope of the delegation clause.

The distinction between challenges to delegation clauses and challenges to arbitration clauses also highlights the factual differences between this case (and *Archer and White*) and cases like *Reyna*. In particular, most cases involve a delegation clause that is a separate and independent sentence from the arbitration clause. *See, e.g.*, *Petrofac*, 687 F.3d at 674–75; *Kubala*, 830 F.3d at 204; *Reyna*, 839 F.3d at 378; *Arnold*, 890 F.3d at 545; *Edwards*, 888 F.3d at 741. For example, in *Reyna*, the Fifth Circuit identified the following as the delegation clause: "The arbitrator(s) shall have the exclusive authority to determine the arbitrability of any dispute which the employee or the employer asserts is subject to the [Policy]." Thus, arguments that the separate arbitration clause did not cover certain claims clearly could not affect the scope of the delegation clause. *See, e.g.*,

---

[7] Determining the scope of the delegation clause is therefore not, as Defendants argue, contrary to the Supreme Court's decision that reversed the Fifth Circuit's first *Archer and White* opinion. (*See* Doc. No. 14 at 15–16). In that opinion, the Supreme Court ruled that courts cannot overwrite the parties' clear and unmistakable decision to delegate arbitrability to the arbitrator. *See Henry Schein*, 139 S. Ct. at 531. Determining the scope of the delegation clause is still analyzing whether such clear and unmistakable intent exists. *See id.* ("We express no view about whether the contract at issue in this face in fact delegated the arbitrability question to an arbitrator.").

*Arnold*, 830 F.3d at 549, 553 (rejecting the argument that the arbitration clause's exception for small claims court cases affected the separate delegation provision that provided that "[a]rbitrations will be conducted by the . . . AAA[] under its rules, including the AAA Consumer Rules."); *see also Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 848 (6th Cir. 2020) ("[T]o the extent that [the] arbitration agreement carves out certain claims from arbitration, it does so from the agreement in general, *not from the provision that incorporates the AAA Rules*. So the carveout goes to the *scope of the agreement*—a question that the agreement otherwise delegates to the arbitrator—not the *scope of the arbitrator's authority* to decide questions of "arbitrability.") (emphasis in original).

In this case (and in *Archer and White*), in contrast, the delegation clause and the arbitration clause share the same qualifying language.[8] (*See* Doc. No. 8, Ex. 1 at 34 ("Seller agrees that any claims and disputes submitted by Seller . . . will be submitted to . . . binding arbitration . . . to be conducted by the [AAA] . . . in accordance with its Commercial Rules and Procedures."). *See also Archer & White*, 935 F.3d at 277. Thus, arguments about what claims are subject to arbitration share significant overlap with arguments about what claims fall under the scope of the delegation agreement. *See, e.g.*, *Blanton*, 962 F.3d at 848 ("Imagine that [the] arbitration agreement said that 'the arbitration (except as to [the claims at issue in that case]) will be conducted in accordance with then-current [AAA Rules].' In that scenario, one might think that the agreement 'incorporates

---

[8] Moreover, as discussed by the Fifth Circuit in *Archer and White*, the delegation clause in this case is unusual because it does not broadly cover "all claims and disputes." *See*, 935 F.3d at 280; *see also Mem'l Hermann Health Sys.*, 2017 WL 5593523, at *8 ("Moreover, the defendant has not cited and the court has not found any authority holding that a narrow arbitration agreement coupled with incorporation by reference of rules giving an arbitrator power to rule on his own jurisdiction is enough to show that the parties clearly and unmistakably agreed to arbitrate arbitrability."); *cf. Maravilla*, 783 F. App'x at 396 ("The broad and 'unqualified 'any dispute' language in the [arbitration clause] confirms that the delegation of arbitrability was intended to apply to *all* disputes between the parties.'") (quoting *Richland Equip. Co. v. Deere & Co.*, 745 F. App'x 521, 525 (5th Cir. 2018) (emphasis in original)).

the AAA rules—and therefore delegates arbitrability—for all disputes except those under the carve-out.'") (quoting *Archer & White*, 935 F.3d at 281) (emphasis omitted).[9]

In short, the placement of limiting language can be dispositive in analyzing delegation clauses.[10] *Archer & White*, 935 F.3d at 281. Any contrary ruling would have the Court improperly rewriting the parties' contract and risk forcing them to arbitrate arbitrability on claims that they intended a Court to handle. Accordingly, the Court will determine the scope of the delegation clause in the Disputes Provision.

### 3. The Scope of the Delegation Clause

Once again, the delegation clause in the Disputes Provision provides:

> Seller agrees that any claims and disputes *submitted by Seller* which cannot be resolved through direct negotiation between Buyer and Seller will be submitted to mediation and, if not successful, to binding arbitration, both proceedings to be conducted by the [AAA] in Houston, Texas, in accordance with its Commercial Rules and Procedures.

(*See* Doc. No. 8, Ex. 1 at 34 (emphasis added)). Since incorporating the AAA rules constitutes clear and unmistakable evidence of delegating the arbitrability question to the arbitrator, *see*

---

[9] The Court also notes that in *Oracle*, the Ninth Circuit dealt with the following arbitration agreement:

> Any dispute arising out of or relating to this License shall be finally settled by arbitration as set out herein, except that either party may bring any action, in a court of competent jurisdiction (which jurisdiction shall be exclusive), with respect to any dispute relating to such party's Intellectual Property Rights or with respect to Your compliance with the TCK license. Arbitration shall be administered: (i) by the American Arbitration Association (AAA), (ii) in accordance with the rules of the United Nations Commission on International Trade Law (UNCITRAL) (the "Rules") in effect at the time of arbitration as modified herein; and (iii) the arbitrator will apply the substantive laws of California and United States.

*Oracle*, 724 F.3d at 1071. Unlike *Archer and White*, the carve-out provision in *Oracle* only applied to the arbitration clause, not both the arbitration and delegation clause. *Compare id.*, *with Archer & White*, 935 F.3d at 277.

[10] Defendants argue that *Archer and White* is distinguishable to this case because there is no express carve-out in the Disputes Provision. (Doc. No 14 at 16–17). The Court finds this to be a distinction without a difference. Whether the delegation clause applies to all claims with expressed exceptions (as in *Archer and White*) or it only applies to a narrow set of claims (as is the case here), the key fact is that the Court must determine whether the limited scope of the delegation clause expresses a clear and unmistakable intent to have the arbitrator decide arbitrability of the particular claims at issue.

*Petrofrac*, 687 F.3d at 675, the Court's inquiry must focus on which claims incorporate the AAA rules. The answer to that question is easily determined by the contract's text: "any claims and disputes submitted by Seller." (Doc. No. 8, Ex. 1 at 34).

It is undisputed that J2 Resources is the "Seller" under the parties' various contracts. Thus, the delegation clause clearly covers any claims and disputes submitted by J2 Resources. As stated above, the pending AAA arbitration was initiated by Defendants to adjudicate their causes of action against J2 Resources for breach of contract, breach of express warranty, and breach of implied warranty of merchantability. (Doc. No 8, Ex. 1 at 7–15).

The Court finds that the contract clearly and unmistakably demonstrates that the parties did *not* intend for Defendants' (i.e., Buyer's) claims and disputes to incorporate the AAA rules. Like a delegation provision that expressly excludes certain issues cannot apply to those excluded issues, a provision that expressly limits delegation to claims and disputes submitted by one party contract cannot apply to those submitted by the other party. *See Archer & White*, 935 F.3d at 281–82. In fact, here it is much clearer that there is not a delegation. In *Archer and White* the injunctive relief claims were delegated, but then carved-out. *See id.* at 277, 281–82. Here, there is no delegation of Defendants' claims at all. Therefore, the question of arbitrability of Defendants' breach of contract, breach of express warranty, and breach of implied warranty of merchantability claims belongs to the Court, not the arbitrator.

Defendants' arguments to the contrary are not persuasive. They claim that their causes of action against J2 Resources were disputes "submitted by Seller" because a "dispute" is "an assertion of aright [sic], claim, or demand on one side, met by contrary claims or allegations on the other." (Doc. No. 14 at 19 (quoting *Dispute*, Black's Law Dictionary (10th ed. 2014)). In other words, Defendants argue that:

> a dispute is not formed until an opposing party responds to a demand. Such a
> dispute was submitted by J2 [Resources] (as Seller) when it emailed Buckeye
> denying any liability for the [allegedly] defective pipe and informing Buckeye of
> its refusal to comply with J2's warranty obligation. . . . Because this denial was
> submitted by J2 to Buckeye, it necessarily is a "dispute[] submitted by Seller" that
> must be submitted to arbitration.

(*Id.* (citing Doc. No. 14, Ex. H)).

The Court rejects Defendants' argument that J2 Resources submitted a dispute when it denied Buckeye's demand email. (*See* Doc. No. 14 at 19). That conflates submitting a dispute with denying one exists. Furthermore, the Court agrees with J2 Resources that Defendants' interpretation of the delegation clause would render the phrase "submitted by Seller" meaningless. (Doc. No. 15 at 4). The "disputes" at issue are Defendants' contract and warranty causes of action. It is unreasonable to say that J2 Resources submitted those to Buckeye, Wood River, or anyone else.[11]

Based on the plain and ordinary meaning of the Disputes Provision, the Court finds that the parties did *not* intend the phrase "disputes submitted by Seller" to mean a "refusal of a claim submitted by Buyer." *See, e.g.*, *URI Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 764 (Tex. 2018) ("We therefore 'presume parties intend what the words of their contract say' and interpret contract language according to its 'plain, ordinary, and generally accepted meaning' unless the instrument directs otherwise.") (first quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010); and then quoting *Heritage Res., Inc. v. NationsBank*,

---

[11] There are further absurd consequences to Defendants' proposed interpretation of the Disputes Provision. For example, the first sentence requires J2 Resources to submit in writing within 60 days of the earlier of: (1) final payment; or (2) discovery of the underlying facts. (Doc. No. 1, Ex. 1 at 34). Under Defendants' definition of "dispute," J2 Resources' May 6th email refusing Defendants' May 1st demand (Doc. No. 14, Ex. H) was likely untimely before Defendants even sent the demand. Specifically, if J2 Resources is said to have discovered the facts of Defendants' claims on February 23rd—the date of Buckeye's first email (Doc. No. 14, Ex. E)—then J2 Resources had to "submit the dispute in writing to" Buckeye by April 23, 2020, which was over a week before Defendants sent the demand email (Doc. No. 14, Ex. G). Moreover, assuming that Buckeye made a final payment to J2 Resources more than 60 days before it sent its first email complaining of the pipes at issue in this case, J2 Resources would be untimely in submitting a dispute it did not even know existed.

939 S.W.2d 118, 121 (Tex. 1996)). The parties easily could have written "all disputes" or "claims submitted by either party," but they limited the language to "disputes submitted by Seller." The Court must give effect to the words that the parties chose to use.

Lastly, Defendants assert that the Court must delegate this case to the arbitrator because "[i]n this very lawsuit, J2 [Resources] submits a dispute as to whether the AAA has jurisdiction over the claims filed in the arbitration." (Doc. No. 14 at 17). This argument, although creative, is also unavailing. First of all, this suit for declaratory judgment and/or for an injunction is not a claim or dispute arising under the purchase order. This lawsuit therefore is not subject to the Disputes Provision.

More generally, even in contracts containing delegation clauses with broad, all encompassing language, courts are empowered to make certain rulings. It is well-established that the Court must determine whether a valid delegation clause exists. *Kubala*, 830 F.3d at 202. As explained above, this includes analyzing the scope of the delegation and any other challenges to the delegation clause. *See, e.g.*, *Rent-A-Ctr.*, 561 U.S. at 72; *Edwards*, 888 F.3d at 744. The Court would be powerless to interpret a challenge to a delegation clause if the clause itself was delegated to the arbitrator to decide. Further, the Court can review an arbitrator's decision, albeit on narrow grounds. *See First Options*, 514 U.S. at 942. Defendants' extension of "any disputes" would strip the Court of the review power; meaning that a review of the arbitration itself is a dispute that the arbitrator gets to decide.

The Court also notes the Catch-22 in Defendants' argument. Claims and disputes that they submit to arbitration are not covered by the delegation clause; however, if they ignore that fact and initiate an arbitrary proceeding on those claims J2 Resources has two options: (1) waive the jurisdictional objection and be forced to arbitrate arbitrability (and other issues); or (2) object to

arbitration, which constitutes as a submitted dispute, thereby forcing it to arbitrate arbitrability. It is a "heads I win, tails you lose" situation for Defendants that allows them to effectively arbitrate any and all claims, despite the plain language of the parties' contract to the contrary.[12]

In short, the Court cannot and will not modify or rewrite the parties' delegation clause. *See Barrow-Shaver*, 590 S.W.3d at 481. It says that the AAA rules are incorporated for any claims and disputes submitted by Seller, which is J2 Resources. Claims and disputes submitted by Defendants are not covered by that delegation. Accordingly, the Court concludes that the parties did not agree to submit arbitrability to the arbitrators as to Defendants' claims for breach of contract, breach of express warranty, and breach of implied warranty of merchantability.

## IV.    Arbitrability of Defendants' Claims

Since the delegation clause in the Disputes Provision does not apply to Defendants' claims, the Court must determine whether those claims are covered by the parties' arbitration clause. *See First Options*, 514 U.S. at 946. When deciding whether the parties agreed to arbitrate a certain matter, courts generally should apply ordinary state law principles that govern the formation of contracts. *Id.* at 943; *see also Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996). "[T]here is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *AT & T Techs.*, 475 U.S. at 650 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–

---

[12] It is also worth noting that J2 Resources objected to the AAA's jurisdiction before filing this lawsuit. (Doc. No. 8, Ex. 2). That objection, however, did not prevent the AAA from planning to impanel arbitrators. Thus, the only thing that prevented J2 Resources from being forced to arbitrate arbitrability on claims that are not covered by the delegation clause was to file this lawsuit. In that sense, this declaratory judgment action is more akin to a petition for a writ mandamus on the AAA's jurisdictional decision than a claim or dispute under the parties' contracts. *See In re JPMorgan Chase & Co.*, 916 F.3d 494, 499 (5th Cir. 2019) (describing a writ of mandamus as a "drastic and extraordinary remedy" reserved for cases where, among other things, the petitioner has no other adequate means to attain the relief he desires) (citing *Cheney v. Untied States Dist. Court*, 542 U.S. 367, 380 (2004)).

83 (1960)). Simply put, "[d]oubts should be resolved in favor of coverage." *United Steelworkers*, 363 U.S. at 583.

Although "ambiguities in the language of the agreement should be resolved in favor of arbitration . . . [courts] do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) (internal citation omitted); *see also Hebbronville Lone Star Rentals, LLC v. Sunbelt Rentals Indus. Servs., LLC*, 898 F.3d 629, 632–33 (5th Cir. 2018) ("The policy that favors resolving doubts in favor of arbitration cannot serve to stretch a contractual clause beyond the scope intended by the parties.") (internal quotations omitted). The presumption of arbitrability must be balanced with the fact that arbitration is a matter of consent, not coercion. *Mem'l Hermann Health Sys.*, 2017 WL 5593523, at *9 (quoting *Waffle House*, 534 U.S. at 294); *see also Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 474–75 (1989) (stating that the FAA "does not confer a right to compel arbitration of any dispute at anytime; it confers only the right to obtain an order directing that 'arbitration proceed in the manner provided for in [the parties'] agreement.'") (emphasis omitted) (quoting 9 U.S.C. § 4).

"Keeping in mind the strong federal policy in favor of arbitration, it is also important to note that the Fifth Circuit has made a distinction between 'narrow' and 'broad' arbitration clauses." *Coffman v. Provost * Umphrey Law Firm, L.L.P.*, 161 F. Supp. 2d 720, 725 (E.D. Tex. 2001), *aff'd sub nom. Coffman v. Provost Umphrey LLP*, 33 F. App'x 705 (5th Cir. 2002); *accord Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998). A "narrow" arbitration clause is typically one that "only requires arbitration disputes 'arising out of' the contract" rather than "disputes that 'relate to' or 'are connected with' the contract." *See Pennzoil,*

139 F.3d at 1067. When analyzing the scope of a narrow arbitration clause, a case should not be referred to arbitration unless the dispute at issue falls within that narrow clause. *See Baudoin v. Mid-La. Anesthesia Consultants, Inc.*, 306 F. App'x 188, 192 (5th Cir. 2009); *Coffman*, 161 F. Supp. 2d at 725.

As described in detail above, the arbitration clause shares the same language with the delegation clause. (*See* Doc. No. 8, Ex. 1 at 34 ("Seller agrees that any claims and disputes submitted by Seller . . . will be submitted to . . . binding arbitration . . . conducted by the [AAA] . . . in accordance with its Commercial Rules and Procedures.")). Thus, the Court's analysis as to whether Defendants' causes of action against J2 Resources qualify as "disputes submitted by Seller" is the same.[13] Consequently, the arbitration clause does not cover those claims just like the delegation clause did not cover them.

The plain and ordinary meaning of the parties' contract is that claims and disputes submitted by J2 Resources are subject to the arbitration clause; claims and disputes submitted by anyone else are not covered. Buckeye and Wood River's causes of action are not claims or disputes submitted by J2 Resources.

The strong presumption of arbitration does not save Defendants. *See Waffle House*, 534 U.S. at 294; *Hebbronville Lone Star Rentals*, 898 F.3d at 632–33. There is no ambiguity here. The arbitration clause, as written, simply is not susceptible to an interpretation that covers their asserted claims. *See United Steelworkers*, 363 U.S. at 582–83. The Court cannot and will not rewrite the terms of the parties' agreement to accommodate Defendants—"notably, the party that

---

[13] The Court finds the arbitration clause is narrow because the "claims and disputes submitter by Seller" in the second sentence of the Disputes Provision is modified by the first sentence, which clarifies the disputes must arise under the purchase order. (*See* Doc. No. 1, Ex. 1 at 34). *See also Pennzoil*, 139 F.3d at 1067. Moreover, the language limited the scope of the claims subject to arbitration clearly indicates that the clause is narrow. *See Archer & White*, 2016 WL 7157421, at *5 ("[T]he ultimate question turns on the clause's express exclusion, which excludes from arbitration 'actions seeking injunctive relief.'").

drafted the agreement—[who] could have negotiated for more precise language." *Archer & White*, 2016 WL 7157421, at *6 (footnote omitted). "It is the duty of the courts to 'enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms.'" *Id.* (first quoting *Volt Info. Scis.*, 489 U.S. at 478; and then citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967) ("[T]he purpose of Congress [in passing the FAA] was to make arbitration agreements as enforceable as other contracts, but not more so.")).

Therefore, the claims in the pending AAA arbitration do not fall under the Disputes Provision's narrow arbitration clause. The arbitration thus lacks jurisdiction to adjudicate the Defendants' claims. *See Baudoin*, 306 F. App'x at 192; *Coffman*, 161 F. Supp. 2d at 725.

## V.    Remaining Preliminary Injunction Factors

To summarize, the Court finds that Defendants' claims are: (1) not covered by the delegation clause; and (2) not subject to the arbitration clause. As such, J2 Resources has clearly demonstrated a substantial likelihood of success on the merits of its declaratory judgment action. Defendants did not address the remaining three preliminary injunction factors in their brief. (*See generally* Doc. No. 14). The Court interprets this as an indication that those factors are not contested and therefore waived.

Nevertheless, the Court will briefly analyze each factor. First is a substantial threat of irreparable harm if the injunction is not granted. *See City of El Cenizo*, 890 F.3d at 176. "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs.*, 475 U.S. at 648. That is, arbitration is not a matter of coercion. *Waffle House*, 534 U.S. at 294. Accordingly, "[b]eing compelled to arbitrate a dispute where the parties have not agreed to arbitrate constitutes irreparable harm *per se*." *Charlotte Mecklenburg Bd. of Educ. v. 34 ED, LLC*, No. 3:20CV259, 2020 WL 3971921, at *6 (W.D.N.C. July 14, 2020) (collecting cases); *accord*

*Credit Suisse Sec. (USA) LLC v. Sims*, No. CIV.A. H-13-1260, 2013 WL 5530827, at *3 (S.D. Tex. Oct. 4, 2013) ("Plaintiffs will suffer irreparable harm if they are forced to participate in an arbitration where the dispute is not subject to an agreement to arbitrate.") (collecting cases); *Koman v. Weingarten/Invests., Inc.*, No. CIV.A. H-10-1836, 2010 WL 3717312, at *9 (S.D. Tex. Sept. 17, 2010).

Turning to the balancing of the respective harm of the parties, the threatened injury to J2 Resources outweighs the threatened harm to Defendants in being enjoined. If no injunction is entered, J2 Resources will be forced to arbitrate claims it never agreed to arbitrate. If the Court is correct, then there is no harm to Defendants as they get exactly what their contract says they get. The threatened harm to Defendants is that the Court is incorrect, and their claims should be arbitrated; but even if that is the case, their "ability to arbitrate this dispute will be delayed rather than precluded." *Credit Suisse*, 2013 WL 5530827, at *4; *see also Koman*, 2010 WL 3717312, at *10 ("The harm suffered by Koman if the court allows the arbitration panel to determine arbitrability is more salient [than the potential harm to the parties seeking to compel arbitration].").

Lastly, there is a strong public policy against holding a party to terms to which it did not agree. *See Koman*, 2010 WL 3717312, at *10 (citing *First Options*, 514 U.S. at 947). Additionally, "'compelling arbitration when parties have not agreed to do so would discourage entities from agreeing to arbitrate at all out of fear that such agreements would be stretched too far in the course of judicial construction.'" *Pershing LLC v. Fulcrum Capital Holdings LLC*, No. 1:20-CV-587-RP, 2020 WL 3883256, at *9 (W.D. Tex. July 9, 2020) (quoting *Raymond James Fin. Servs., Inc. v. Cary*, 709 F.3d 382, 388 (4th Cir. 2013)). "This in itself would undermine the federal policy favoring arbitration." *Cary,* 709 F.3d at 388. Accordingly, J2 Resources has clearly demonstrated all four preliminary injunction factors.

## VI.    Conclusion

Defendants Buckeye Partners, L.P. and Wood River Pipe Lines LLC initiated an arbitration proceeding seeking damages against Plaintiff J2 Resources, LLC for breach of contract, breach of express warranty, and breach of implied warranty of merchantability. Although the parties entered into a valid contract with an arbitration clause, and the contract transferred the question of arbitrability to the arbitrator for a limited class of claims, Defendants' claims against J2 Resources are not within the scope that delegation clause. Likewise, Defendants' claims are not covered by narrow arbitration clause to which the parties agreed.

J2 Resources has therefore clearly established a substantial likelihood of success on the merits of its declaratory judgment action. Additionally, J2 Resources has demonstrated that a substantial threat it will suffer irreparable harm absent a preliminary injunction, the threatened injury to it outweighs the threatened harm to Defendants, and entering a preliminary injunction will not disserve the public interest.

Accordingly, the Court hereby grants J2 Resource's emergency motion (Doc. No. 7), stays the pending arbitration between the parties, and enjoins Defendants from proceeding with the arbitration discussed above. J2 Resources shall post a $7,500 bond as the Court finds the possible monetary harm to Defendants to be minimal.

The parties are to meet and confer, and to propose to the Court a schedule to resolve any and all remaining issues.

SIGNED at Houston, Texas this 23rd day of July, 2020.

Andrew S. Hanen
United States District Judge

30